BASCHAB, Judge.
The appellant, C.L.Y., was adjudicated delinquent based on a charge of first-degree sexual abuse of K.H.,[1] a violation of § 13A-6-66(a)(l), Ala.Code 1975. The juvenile court ordered that he be committed to the custody of the Department of Youth Services. The appellant did not file any post-adjudication motions. This appeal followed.
The victim in this case made several statements that indicated that her seventeen-year-old uncle had sexually abused her. She was three years old at the time of the incidents. Citing § 15-25-31, Ala. Code 1975, the State filed a motion to admit several out-of-court statements the victim had made, and the defense opposed the motion. Before the delinquency hearing started, the juvenile court conducted a hearing on the admissibility of the victim’s out-of-court statements, and several witnesses testified on behalf of the State.
J.H., the victim’s mother and the appellant’s adoptive sister, testified that, around the end of January 2002, the appellant stayed with her children while she picked up her husband from work. That night, the victim woke up in the middle of the night crying and said that the appellant had “licked her pee pee.” (R1. 21.)[2] J.H. also testified that, around Mother’s Day of 2002, several family members were at her mother’s residence, where the appellant also resided. During that visit, the victim *1049 went to the appellant’s bedroom to play a game. When she came out of the bedroom, she told her twin sister that the appellant had “touched her pee pee” and that they had been in the appellant’s bedroom, where she had gone “to play the game.” (Rl. 17.) J.H. further testified that, a week or two later, she and her mother took the victim to the emergency room. While she was there, the treating doctor asked the victim generally about whether she had ever been touched. In response, the victim
“made a statement stating the fact that a car that was at my mother’s house, and was broke down. She said that [the appellant] had her in the car and was rubbing lotion on her pee pee.
[[Image here]]
“... She said that they were in the car and he pulled her panties off and was rubbing her vaginal area and something about putting lotion on her.”
(Rl. 18-19.) J.H. explained that, when the victim made the statement at the hospital, they were not sure what she was talking about because she referred to “mamma’s new car.” (Rl. 27.) However, subsequently, while J.H. and her sister were painting in a bathroom in her residence, the victim again made a statement about the appellant and a vehicle.
“She stated that [the appellant] took her down to the barn, behind the bushes at Mee Maw’s house and he was rubbing his pee pee and trying to tickle the inside of hers....
[[Image here]]
“... She also had stated — She repeated the story she had told about at the old house. She repeated the story of the car incident and we didn’t really know the whole situations of the cars, when my husband had moved the car to our house and she stated, ‘[T]hat’s the car outside that [the appellant] and I was in when he was rubbing my pee pee,’ is what she had said.”
(R1. 20.) J.H. explained that the vehicle had previously been at her mother’s house and had been broken down. On the day the victim made the statement in the bathroom, the vehicle had been moved to J.H.’s residence. Finally, J.H. testified that the victim used the term “pee pee” to describe her own genitalia and male genitalia. (R1. 20.)
W.H., the victim’s father and J.H.’s husband, also testified about the statement the victim made after the appellant had stayed with her in January 2002. Around midnight that night, after everyone had gone to bed, the victim “got up and came to our room and started talking to [J.H.] about [the appellant] licking her pee pee.” (R1. 29.) W.H. also testified that, around Mother’s Day of 2002, the victim and her twin sister were on the floor playing and the victim told her sister that “[the appellant] had touched her pee pee.” (R1. 29.) W.H. further testified that he heard the statements the victim made to J.H. about the appellant and the vehicle while J.H. and her sister were painting the bathroom. The victim stated that the appellant “was rubbing lotion ... [o]n her legs and on her pee pee and on her arms.” (R1. 30.) Finally, W.H. confirmed that the victim uses the term “pee pee” to refer to her vagina and to male genitalia. (R1. 31.)
J.Y., the victim’s grandmother and the appellant’s adoptive mother, testified that, during Mother’s Day weekend of 2002,
“[w]e were sitting by the pool and I saw [the appellant] with [the victim] and he was coming out of the bushes, along side the pool area, and I asked him what he was doing and he said he was [taking the victim] to the barn and I said, ‘[F]or what?’ And he said [the victim] wanted to see the chickens.”
*1050 (R1. 54.) She also testified that, later that day, the victim “[came] down the hall and said that [the appellant] pulled her pants down and touched her pee pee.” (R1. 44.) Finally, J.Y. testified that, when she and J.H. later took the victim to the hospital, the victim “told the doctor that [the appellant] pulled her pants down and touched her down there. And she also told the doctor that he had put lotion on her.” (R1. 45.)
C.Y, the victim’s grandfather and the appellant’s adoptive father, testified that, around Mother’s Day of 2002, he heard the victim make a statement about the appellant to her twin sister. At that time, the victim said “that [the appellant] pulled her pants down and touched her on her pee pee.” (R1. 37.). He also testified that she repeated the statement “a couple of different times” to her sister. (R1. 37.)
C.C., the victim’s aunt and the appellant’s adoptive sister, testified that, around Mother’s Day weekend of 2002, the victim “was playing with her sister and she said, ‘[The appellant] touched my pee pee.’ ” (R1. 77.) She also testified that, while she and J.H. were painting J.H.’s bathroom, the victim said, “ ‘[The appellant] touched my pee pee and put lotion on my pee pee and my legs.’ ” (R1. 77.)
M.C., the victim’s uncle and C.C.’s husband, testified that, while he was watching television during Mother’s Day weekend of 2002, he heard the victim and her twin sister talking to each other. One of the girls said that the appellant had touched her pee pee and asked the other girl if he had touched hers, and the other girl responded that he had. He was not sure whether the victim or her twin sister had made the statement, and he and his wife asked the girls to repeat what they had said. He testified that he believed that, at that time, the victim’s twin sister said that the appellant had touched her pee pee, and the victim agreed.
Tammy Dawn Bardimes, who was employed by the Mobile County Department of Human Resources, interviewed the victim regarding her allegations of sexual contact by the appellant. She testified that she discussed good and bad touches and that, afterward, the victim
“disclosed that on one occasion [the appellant] had taken her behind the bushes at her Mee Maw’s house, referring to her grandmother, and he had touched her in her vagina area and he had also touched himself at that time. She also disclosed on another occasion, Much was what the original report was about, that [the appellant] had touched her [on her vaginal area] in his bedroom.”
(R1. 56.) Bardimes also testified that various family members had made statements to her that were not consistent with their testimony during the hearing. However, the family members disputed that testimony or explained any perceived inconsistencies.
During the delinquency hearing, the witnesses again testified for the State. Although much of their testimony was similar to their previous testimony, some of them also presented additional testimony about the statements the victim had made.
J.H. testified that various family members were at her mother’s residence during Mother’s Day weekend of 2002. One afternoon, the victim told her twin sister two or three times that the appellant had touched her pee pee. Immediately before she made the statement, she had been in the appellant’s room playing a game. J.H. further testified that
“[t]here was times I sat with her and she would talk to me and she told me that [the appellant] had touched her in her vaginal area — well, touched her pee pee while he was rubbing his. She had *1051 also made a statement about [the appellant] rubbed lotion on her in mommy’s new car, is what it was, behind the bushes at Mee Maw’s house. She had also made a statement one time that [the appellant] had took her in his room and wouldn’t let her out and was touching her pee pee in there.”
(R2. 7.) Finally, she testified that, after she took the victim to the emergency room, the victim
“made a statement stating that he had rubbed lotion on her pee pee in mommy’s new car ....
[[Image here]]
“... [W]hen we did bring the car home we found out exactly what she meant by [the appellant] putting lotion on her in the car because she told us, ‘[The appellant] had me in that car, your new car,’ she said.”
(R2. 8.)
W.H. testified that, while the family was at the victim’s grandparents’ residence during Mother’s Day weekend of 2002, the victim told her twin sister that the appellant “had touched her pee pee.” (R2. 14.) He also testified that, on a previous occasion, the victim had come into their bedroom and told them that the appellant “had licked her pee pee.” (R2. 15.) He further testified that, on another occasion, he had overheard the victim tell J.H. “that [the appellant] had rubbed lotion on her legs and on her pee pee.” (R2. 15.) Finally, he testified that the victim used the term “pee pee” to refer to her vagina. (R2.15.) '
C.Y. testified that, during Mother’s Day weekend of 2002, he heard the victim say to her twin sister that the appellant “pulled her panties down and touched her on her pee pee.” (R2. 21.) He also testified that the appellant and the victim were supposed to have been in the appellant’s bedroom playing a game immediately before the victim made the statement. However, as he was going down the hallway of the residence, he had “seen [the appellant] come out of the bedroom, the door had been closed, which it was suppose to have been open-, and I saw [the victim] sitting on the floor ... in the bedroom.” (R2. 22.)
J.Y. testified that, during Mother’s Day weekend of 2002, one afternoon while the others were sitting at the pool, the appellant told hfer he was taking the victim to the barn. She noted that there was a broken down vehicle beside the barn. Shortly thereafter, the appellant returned and told J.Y. that he and' the victim were going into the house. Later that day, the victim came from down the hall and said that the appellant “touched her pee pee.” (R2. 28.) A few minutes later, she repeated the statement to her twin sister. J.Y. further testified that she and J.H. subsequently took the victim to the emergency room and that' the victim had “told the doctor that [the appellant] put lotion on her and she told the doctor that he touched her.” (R2. 29.)
M.C. testified that, while various family members were at J.Y.’s residence during Mother’s Day weekend, he heard the victim say that the appellant “had licked her pee pee.” (R2. 34.) He also testified that he had seen the victim in the appellant’s bedroom playing a game that day. He further testified that, sometime during the weekend, he had seen the appellant going to the barn with the victim or her twin sister.
C.C. testified that, while they were at her parents’ residence during Mother’s Day weekend of 2002, the victim said that the appellant had “touched her pee pee.” (R2. 40.) She also testified that the appellant and the victim had gone to the appellant’s bedroom to play a game and that, *1052 later, she had seen the two of them walking toward the barn on two occasions. C.C. further testified that, one or two months later, when she and J.H. were painting J.H.’s bathroom, the victim told them that the appellant “had touched her pee pee.” (R2. 41.)
I.
The appellant argues that the juvenile court erroneously admitted the victim’s out-of-court statements into evidence. With regard to the admissibility of out-of-court statements by child victims, § 15-25-31, Ala.Code 1975, provides:
“An out-of-court statement made by a child under 12 years of age at the time of the proceeding concerning an act that is a material element of any crime involving child physical offense, sexual offense, and exploitation, as defined in Section 15-25-39, which statement is not otherwise admissible in evidence, is admissible in evidence in criminal proceedings, if the requirements of Section 15-25-32 are met.”
Section 15-25-32, Ala.Code 1975, provides:
“An out-of-court statement may be admitted as provided in Section 15-25-31, if:
“(1) The child testifies at the proceeding, or testifies by means of video tape deposition as provided by Section 15-25-2, or testifies by means of closed circuit television as is provided in Section 15-25-3, and at the time of such testimony is subject to cross-examination about the out-of-court statements; or
“(2)a. The child is found by the court to be unavailable to testify on any of these grounds:
“1. The child’s death;
“2. The court finds that there are reasonable grounds to believe that the defendant or someone acting on behalf of the defendant has intentionally removed the child from the jurisdiction of the court;
“3. The child’s total failure of memory;
“4. The child’s physical or mental disability;
“5. The child’s incompetency, including the child’s inability to communicate about the offense because of fear or a similar reason; or
“6. Substantial likelihood that the child would suffer severe emotional trauma from testifying at the proceeding or by means of closed circuit television; and
“b. The child’s out-of-court statement is shown to the reasonable satisfaction of the court to possess particularized guarantees of trustworthiness.”
A.
First, the appellant contends that the State did not present expert testimony[3] to establish that the victim was unavailable on any of the grounds set forth in § 15-25-32(2)a., Ala.Code 1975. During the hearing on the admissibility of the out-of-court statements, Dr. Larry Faison testified that he had examined the victim to determine her ability to present information about the case. At the time he evaluated her, the victim was four years and one month old. During the State’s direct examination of Dr. Faison, the following occurred:
*1053 “[PROSECUTOR]: What information did you gather as part of the developmental history interview?
“[DR. FAISON]: Developmentally she appeared to be somewhat delayed in learning just some of the basic features that you would expect at this age like color, letters, numbers, shapes. She could not readily identify body parts such as nose, feet, hands, legs, toes and those types of things. She was [a] very reserved child and beyond that it was rather difficult to get any further information. She was extremely shy socially and ... I thought that was rather unusual for most children this age.
“[PROSECUTOR]: And as a trained psychologist what conclusion did you draw from the behavior you observed?
“[DR. FAISON]: She appeared to be certainly developmentally delayed, possibly from some type of trauma. I can’t be specific of course. Her language skills were just virtually [nil] to be able to describe things to me. Because of [her] social shyness.
“[PROSECUTOR]: In your opinion could she cooperate with the State’s prosecution of [the appellant] for offenses committed against her?
“[DR. FAISON]: I wouldn’t think she would be able to have the verbal skills to do so.”
(R1. 10.) Dr. Faison testified that the victim would not be able to communicate because she was developmentally delayed and socially shy. Therefore, his testimony established that the victim was not competent to testify and was therefore unavailable pursuant to § 15-25-32(2)a.5., Ala. Code 1975.
The appellant also contends that the juvenile court erred because it did not make specific findings as to the victim’s unavailability. However, he did not first present this argument to the juvenile court. “Even in juvenile cases, proper and timely objections are required.” M.W. v. State, 571 So.2d 361, 362 (Ala.Crim.App.1990). Therefore, the appellant’s argument is not properly before this court.
Moreover, the juvenile court’s “technical noncompliance with § 15-25-38 was harmless.” K.D.H. v. State, 849 So.2d 983, 991 (Ala.Crim.App.2002). Based on our review of Dr. Faison’s testimony and the statutory grounds for unavailability of a child witness, as set forth in § 15-25-32(2)a., Ala.Code 1975, we conclude that the victim was unavailable to testify at the hearing.
B.
Second, the appellant contends that the victim’s statements did not possess particularized guarantees of trustworthiness. In this regard, § 15-25-37, Ala.Code 1975, provides:
“In determining whether a statement possesses particularized guarantees of trustworthiness under Section 15-25-32(2)b, the court shall consider any one, but is not limited to, the following factors:
“(1) The child’s personal knowledge of the event;
“(2) The age and maturity of the child;
“(3) Certainty that the statement was made, including the credibility of the person testifying about the statement;
“(4) Any apparent motive the child may have to falsify or distort the event, including bias, corruption, or coercion;
“(5) The timing of the child’s statement;
“(6) Whether more than one person heard the statement;
*1054 “(7) Whether the child was suffering from pain or distress when making the statement;
“(8) The nature and duration of any alleged abuse;
“(9) Whether the child’s young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child’s knowledge and experience;
“(10) Whether the statement has a ‘ring of verity,’ has an internal consistency or coherence, and uses terminology appropriate to the child’s age;
“(11) Whether the statement is spontaneous or directly responsive to questions;
“(12) Whether the statement is suggestive due to improperly leading questions;
“(13) Whether extrinsic evidence exists to show the defendant’s opportunity to commit the act complained of in the child’s statement.”
Based on the testimony presented both during the hearing on the admissibility of the out-of-court statements and the adjudication hearing, we conclude that the victim’s out-of-court statements possessed particularized guarantees of trustworthiness. First, the victim made the statements based on her personal knowledge about the events. See § 15-25-37(1), Ala. Code 1975. Second, several witnesses testified positively that the victim made each of the statements. See § 15-25-37(3), Ala. Code 1975. Third, the victim did not have any apparent motive to falsify or distort the events. See § 15-25-37(4), Ala.Code 1975. Fourth, the timing of the victim’s statements supports their trustworthiness. See § 15-25-37(5), Ala.Code 1975. She made the January 2002 statement around midnight after the appellant had stayed with her and her siblings; she made the statement about the appellant’s actions in his bedroom immediately after she came down the hall from his bedroom; and she made the statements in the bathroom about the events that occurred in a vehicle that had been parked at her grandmother’s residence on the very day the vehicle had been moved to her parents’ residence. Fifth, more than one person heard each of the statements. See § 15-25-37(6), Ala. Code 1975. Sixth, the victim’s young age makes it unlikely that she fabricated the statements. See § 15-25-37(9), Ala.Code 1975. In this regard, Dr. Faison testified that, in his experience, “sexual fantasies are very uncommon [in] children of this age,” and “usually there has to be some experiential base for the child to formulate the fantasy.” (R1. 12, 13.) Seventh, the statements had a “ring of verity,” were internally consistent, and used terminology that was appropriate to the victim’s age. See § 15-25-37(10), Ala.Code 1975. Eighth, the victim made the statements, except for the statements to the emergency room doctor and to Bardimes, spontaneously and not in response to any type of questioning. See §§ 15-25-37(11) and 15-25-37(12), Ala.Code 1975. Furthermore, the statements she made to the emergency room doctor and to Bardimes were consistent with and cumulative to statements she made to other people. Ninth, extrinsic evidence showed that the appellant had the opportunity to commit the acts about which the victim complained. See § 15-25-37(13), Ala.Code 1975. See Part C., infra. For these reasons, we conclude that the out-of-court statements possessed particularized guarantees of trustworthiness, as required by § 15-25-32(2)b., Ala.Code 1975.
The appellant also contends that the juvenile court erred because it did not make specific findings regarding the trustworthiness of the victim’s statements. At the end of the hearing on the admissibility *1055 of the out-of-court statements, the juvenile court stated:
“There’s overwhelming support for each of the statements made in the presence of numerous individuals, including the social worker. The statements are admitted into evidence.”
(R1. 80.) However, even if these findings were not sufficient to satisfy the requirements of § 15-25-38, Ala.Code 1975, “this technical noncompliance with § 15-25-38 was harmless” because, for the reasons set forth herein, we conclude that the out-of-court statements possessed particularized guarantees of trustworthiness. K.D.H. v. State, 849 So.2d at 991.
C.'
Third, the appellant contends that the State did not present any evidence to corroborate the acts described in the victim’s out-of-court statements. In this regard, § 15-25-34, Ala.Code 1975, provides:
“Before a statement may be admitted pursuant to this article on the grounds that the child declarant is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.”
In K.D.H., supra, we stated:
“ ‘Corroborative evidence need not be strong, and need not be sufficient in and of itself to support a conviction; it need not directly connect the accused with the crime, but only tend to do so.’ Goodwin v. State, 644 So.2d 1269, 1275 (Ala.Crim.App.1993), quoted with approval in Ex parte Hardley, 766 So.2d 154, 157 (Ala.1999). As the Alabama Supreme Court has noted: ‘ “The probative value of the evidence need'only legitimately tend to connect the accused with the crime and need not directly do so.” ’ Ex parte Hunt, 744 So.2d 851, 858 (Ala.1999), quoting Mills v. State, 408 So.2d 187, 191 (Ala.Crim.App.1981). Moreover, circumstantial evidence is sufficient to show corroboration. See Goodwin, 644 So.2d at 1275.”
849 So.2d at 990.
During the hearing on the admissibility of the victim’s out-of-court statements, the State presented sufficient evidence to corroborate the acts described in the statements. With regard to the January 2002 incident, both J.H. and W.H. testified that, on the day the victim made the statement, the appellant had stayed with the victim and her siblings while J.H. picked up W.H. from work. With regard to the incident in the appellant’s bedroom, J.H. and J.Y. both testified that the victim made the statement immediately after she came down the hall. Also, J.H. testified that the victim had gone into the appellant’s bedroom to play a game and that the victim had told her twin sister that she had gone into the appellant’s bedroom to play a game. With regard to the incident in a vehicle near the barn at the victim’s grandparents’ residence, J.H. testified that the victim made a statement about the incident on the day the vehicle to which she referred in the statement had been moved to their residence. Furthermore, J.H. testified that the vehicle had previously been parked at her mother’s residence. Finally, J.Y. testified that, during Mother’s Day weekend of 2002, the appellant had gone through the bushes and had told her that he was taking the victim to the barn to see some chickens.
However, in determining whether the juvenile court properly admitted the victim’s out-of-court statements, we are not bound simply by the evidence presented during the hearing on the admissibility of the statements. See Wilsher v. State, 611 So.2d 1175, 1178 (Ala.Crim.App.1992) (noting that, “[i]n reviewing a [lower] court’s ruling on a motion to suppress, this Court may consider the evidence adduced both at *1056 the suppression hearing and at the [lower court proceeding].”). See also Henry v. State, 468 So.2d 896 (Ala.Crim.App.1984). During the delinquency hearing, the State presented additional evidence that further corroborated the acts described in the victim’s out-of-court statements. Specifically, with regard to Mother’s Day weekend, C.Y. testified that the appellant and the victim had been in the appellant’s bedroom with the door closed immediately before the victim made the statement about the appellant sexually abusing her; M.C. testified that he had seen the victim in the appellant’s bedroom playing a game and that he had seen the appellant going to the barn with the victim or her twin sister; and C.C. testified that the appellant and the victim had gone to the appellant’s bedroom and had subsequently walked toward the barn on two occasions.
We conclude that the State’s evidence tended to connect the appellant with the acts alleged and therefore was sufficient to corroborate the acts described in the victim’s out-of-court statements.
For these reasons, the juvenile court properly admitted the victim’s out-of-court statements into evidence.
II.
The appellant also argues that the adjudication of delinquency was contrary to the weight of the evidence presented at the hearing. “The issue of the weight of the evidence is preserved by a motion for a new trial, stating ‘that the verdict is contrary to law or the weight of the evidence.’ ” Zumbado v. State, 615 So.2d 1223, 1241 (Ala.Crim.App.1993). Because the appellant did not first present this argument to the juvenile court in a post-adjudication motion, it is not properly before this court.
Moreover,
“[i]n Johnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App.1989), this court noted the difference in ‘sufficiency’ and ‘weight’ as follows:
“ ‘The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, “viewing the evidence in the light most favorable to the prosecution, [a] rational factfinder could have found the defendant guilty beyond a reasonable doubt.” Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2215, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App.1984).
[[Image here]]
“ ‘In contrast, “[t]he ‘weight of the evidence’ refers to ‘a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.’ ” Tibbs v. Florida, 457 U.S. at 37-38 [102 S.Ct. at 2216] (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala.1981); Crumpton v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala.1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). ‘“[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.’ ” Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App.1987) (quoting Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931)).[’]
“(Emphasis in original.) See Smith v. State, 604 So.2d 434 (Ala.Cr.App.1992); Pearson v. State, 601 So.2d 1119 (Ala.Cr. *1057 App.1992); Curry v. State, 601 So.2d 157 (Ala.Cr.App.1992).”
Zumbado v. State, 615 So.2d 1223, 1240-41 (Ala.Crim.App.1993). Also, “[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury.” Smith v. State, 698 So.2d 189, 214 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997). In this case, the appellant’s contentions address matters that were for the juvenile court to decide. We will not invade the province of the juvenile court and reweigh the evidence in this case. Therefore, the appellant’s argument that the adjudication of delinquency was contrary to the weight of the evidence is not well-taken.
For the above-stated reasons, we affirm the juvenile court’s judgment.
AFFIRMED.
McMILLAN, P.J., and SHAW and WISE, JJ., concur; COBB, J., dissents, with opinion.

. The delinquency petition refers to the child victim as K.H. The transcript refers to her as C.H.

. "R1” refers to the transcript of the hearing on the admissibility of the victim’s out-of-court statements. "R2” refers to the transcript of the delinquency hearing.

. Section. 15-25-33, Ala.Code 1975, provides:
"A finding of unavailability under Section 15-25-32(2)a.l., 3., 4., 5. and 6. must be supported by expert testimony.”